# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 8, 2008          Decided July 7, 2009

No. 07-1528

GUARD PUBLISHING COMPANY, DOING BUSINESS AS THE
REGISTER-GUARD,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

EUGENE NEWSPAPER GUILD, CWA LOCAL 37194, AFL-CIO,
INTERVENOR

---

Consolidated with 08-1006, 08-1013

---

On Petitions for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

---

*L. Michael Zinser* argued the cause for petitioner Guard
Publishing Company. With him on the briefs was *Glenn E.
Plosa*.

*James B. Coppess* argued the cause for petitioner Eugene

Newspaper Guild, CWA Local 37194, AFL-CIO.  With him on the briefs were *Barbara Camens* and *Laurence Gold*.

*Heather S. Beard*, Attorney, National Labor Relations Board, argued the cause for respondent.  With her on the brief were *Ronald Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Meredith L. Jason*, Supervisory Attorney.

*L. Michael Zinser* and *Glenn E. Plosa* were on the brief for intervenor Guard Publishing Company in support of respondent.

*James B. Coppess*, *Barbara Camens*, and *Laurence Gold* were on the brief for intervenor Eugene Newspaper Guild, CWA Local 37194, AFL-CIO in support of respondent.

*Andrew M. Kramer*, *Shay Dvoretzky*, and *Zachary S. Price* were on the brief for *amici curiae* Chamber of Commerce of the United States of America, et al. in support of respondent.

Before: SENTELLE, *Chief Judge*, and GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  The Register-Guard disciplined Suzi Prozanski, a copy editor and union president, for sending three union-related e-mails to her fellow employees.  It also directed Ronald Kangail, a circulation department district manager and union representative, not to wear a union armband or display a union placard in public.  The National Labor Relations Board (NLRB) found that the company committed unfair labor practices by enforcing its e-mail policy with respect to one of Prozanski's three e-mails in a manner that discriminated against the union, and by prohibiting Kangail's

display of union insignia. Because these findings were supported by substantial evidence, we deny the company's petition for review and grant the Board's cross-application for enforcement. However, because the same cannot be said for the Board's determination that the company acted lawfully in disciplining Prozanski for the other e-mails, we grant the union's petition for review and remand that matter for further proceedings.

I

Guard Publishing Company publishes the Register-Guard, a daily newspaper in the Eugene, Oregon area. In 1996, the Register-Guard installed a new computer system and adopted a Communication Systems Policy (CSP) to govern use of communication systems, including e-mail. The CSP provided, inter alia, that:

> Company communication systems and the equipment used to operate the communication systems are owned and provided by the Company to assist in conducting the business of The Register-Guard. Communication systems are not to be used to solicit or proselytize for commercial ventures, religious or political causes, outside organizations, or other non-job-related solicitations.

J.A. 123.

While Register-Guard employees used "e-mail regularly for work-related matters," the Board found that:

> Throughout the relevant time period, the [Register-Guard] was aware that employees also used e-mail to send and receive personal messages. The record

contains evidence of e-mails such as baby announcements, party invitations, and the occasional offer of sports tickets or request for services such as dog walking.

*Guard Publ'g Co.*, 351 N.L.R.B. 1110, 1111 (2007). Employees "sent and received e-mail . . . regarding parties, jokes, breaks, community events, sporting events, births, meeting for lunch, and poker games," and did so "without reprimand." *Id.* at 1134 (ALJ Op.). Managing editor Dave Baker "admitted that he has received personal e-mail from . . . employees and has not disciplined them." *Id.* Among other nonwork-related e-mails, Baker himself sent at least two e-mails seeking volunteers for the newspaper's annual United Way campaign.

Approximately 150 of the company's employees constitute a unit represented by the Eugene Newspaper Guild, CWA Local 37194, AFL-CIO. In May and August of 2000, the company sent union president Suzi Prozanski, a copy editor in the newspaper's features department, written disciplinary warnings for alleged violations of the CSP. The warnings pertained to one e-mail Prozanski sent in May from her workstation (but composed on her break), and two e-mails she sent in August from a computer at the union's office. Prozanski sent all three to numerous unit employees at their Register-Guard e-mail addresses.

The first e-mail, sent May 4, 2000, was entitled "setting it straight" and concerned a union rally held the previous Monday afternoon, May 1. Before that rally, managing editor Baker had e-mailed employees advising them to leave work early because of a police warning that anarchists might attend the rally. Bill Bishop, an employee and union member, then e-mailed a reply to Baker and to other employees, attaching an e-mail from the police to the union indicating that it was the company that had

warned the police about anarchists. The ensuing rally was incident-free. Prozanski's May 4 e-mail advised employees that the union had "discovered that some of the information given to you" in Bishop's e-mail "was incomplete." J.A. 129. Although the police e-mail that Bishop had attached "clearly stated the company had called the police," she explained that:

> What we didn't know then is that police had in fact contacted the [Register-Guard] on Sunday, the day before the rally. . . . We regret that many were misled. The internal police e-mail told only half the story -- that the company did contact the police on Monday. But we didn't have all the information about the police contacting the company a day earlier.

*Id.*

The next day, Baker sent Prozanski a disciplinary warning. It stated: "[Y]ou used the company's e-mail system expressly for the purpose of conducting Guild business. As you know, this is a violation of the company's Communication Systems policy." *Id.* at 130. The notice went on to express concern that the e-mail had been posted on the union bulletin board. "Employees who see that e-mail message are likely to assume that it's OK to use the company's e-mail for purposes other than company business. And, of course, that's not true." *Id.*

In August 2000, Prozanski sent employees two more e-mails. The first, sent August 14 and entitled "Go Green," reminded employees to "WEAR GREEN on Tuesday" to "show unity" regarding the union's position in contract negotiations. *Id.* at 127. The second, sent August 18 and entitled "Let's parade," asked for volunteers to help with the union's "fun, entertaining, PRIZE-winning entry in the Eugene Celebration Parade." *Id.* at 128.

On August 22, Cynthia Walden, the Register-Guard's director of human relations, sent Prozanski another disciplinary warning, stating that Prozanski had violated the Communication Systems Policy by using the system "for dissemination of union information." *Id.* at 132. And it reminded her that "[i]n May you . . . told Dave Baker that you would refrain from using the Company's systems for union/personal business." *Id.* On September 5, the union filed a charge with the NLRB alleging that the Company committed an unfair labor practice by sending the August 22 disciplinary warning.

Two months later, an additional point of contention arose between the union and the Register-Guard, this time involving Ronald Kangail. Kangail, a district manager in the circulation department, interacted with independent contractors who served as newspaper carriers and on occasion with subscribers. In November, Kangail began to wear a green armband, indicative of union support, when he was in the field. He also displayed in his car an 8-1/2 by 11-inch green placard promoting support for the union. *Id.* at 137. Zone Manager Steve Hunt, Kangail's supervisor, told Kangail to remove the armband from his arm and the placard from his car when in public. Kangail complied. Although the Register-Guard had no written policy concerning the display of insignia or signs at work, company officials later testified that there was an unwritten policy applicable when dealing with the public. The officials' descriptions of the content of that policy differed. One manager said the policy was that "employees could not wear or exhibit indicia that are controversial in nature, or partisan or political, or . . . otherwise represent the company in a negative context." *Guard*, 351 N.L.R.B. at 1134 (ALJ Op.). Another said the rule was that employees were "not to wear anything that is not appropriate to the business." *Id.* On May 14, 2001, the union filed an additional unfair labor practice charge based on Hunt's direction that Kangail not display the armband and placard.

Based on the charges filed by the union, the NLRB's General Counsel filed complaints alleging, inter alia, that the Register-Guard violated sections 8(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) & (3),[1] by: (1) "maintaining, promulgating, and enforcing an overly broad no-solicitation policy"; (2) "discriminatorily enforcing its no-solicitation policy" by issuing disciplinary warnings to Suzi Prozanski on May 5 and August 22, 2000; and (3) "promulgating and maintaining an insignia policy prohibiting display of union insignia or signs." *Guard*, 351 N.L.R.B. at 1133 (ALJ Op.). An Administrative Law Judge (ALJ) found that the Register-Guard did not violate the NLRA merely by maintaining the Communication Systems Policy, holding that an employer may lawfully limit employee use of the employer's equipment or media. But the ALJ found that the Register-Guard did violate the NLRA by discriminatorily enforcing the policy to prohibit union-related e-mails while allowing a variety of nonwork-related e-mails. In particular, he found that the Register-Guard committed unfair labor practices by disciplining Prozanski for both the May and August e-mails. And he further found that the company violated the NLRA by maintaining and

---

[1]Sections 8(a)(1) and (3) provide:

> It shall be an unfair labor practice for an employer --
> > (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7] of this title;
> > . . .
> > (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

29 U.S.C. § 158(a)(1) & (3); *see infra* note 2 (setting forth the text of section 7, 29 U.S.C. § 157).

enforcing against Kangail an overly broad rule prohibiting employees from wearing or displaying union insignia while working with the public.

On review, the Board agreed with the ALJ that the Register-Guard did not violate the NLRA merely by maintaining a Communication Systems Policy that barred employees from using the company's e-mail system for all nonjob-related solicitations. "Consistent with a long line of cases governing employee use of employer-owned equipment," the Board held, "the employees here had no statutory right to use the [Register-Guard's] e-mail system for Section 7 matters." *Id.* at 1114. "Accordingly," it held, the Register-Guard "may lawfully bar employees' nonwork-related use of its e-mail system, unless [the Register-Guard] acts in a manner that discriminates against Section 7 activity." *Id.* at 1116.[2]

As the CSP did not discriminate against section 7 activity on its face, the Board proceeded to examine whether the company violated section 8(a)(1) "by discriminatorily enforcing the CSP to prohibit Prozanski's union-related e-mails while allowing other nonwork-related e-mails." *Id.* The Board agreed with the ALJ that the Register-Guard discriminatorily enforced the CSP with respect to the May 4 e-mail. The CSP, the Board noted, "prohibited only 'nonjob-related solicitations,' not all non-job-related communications," and the May 4 e-mail "was not a solicitation." *Id.* at 1119. "The only difference between Prozanski's May e-mail and the e-mails permitted by the [Register-Guard] is that Prozanski's e-mail was union-related." *Id.* The Board disagreed, however, with the ALJ's finding regarding the August e-mails. Those e-mails did constitute

---

[2]Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, [and] to form, join, or assist labor organizations . . . ." 29 U.S.C. § 157.

solicitations, the Board said, and although "[t]he evidence shows that the [Register-Guard] tolerated personal employee e-mail messages," including solicitations for "sports tickets or other similar personal items," there was "no evidence that the [Register-Guard] permitted employees to use e-mail to solicit other employees *to support any group or organization*." *Id.* (emphasis added). "Thus, . . . enforcement of the CSP with respect to the August 14 and 18 e-mails did not discriminate along Section 7 lines and therefore did not violate Section 8(a)(1)." *Id.*[3]

Finally, the Board upheld the ALJ's conclusion that the Register-Guard "violated Sec. 8(a)(1) by maintaining an overly broad rule prohibiting employees from wearing or displaying union insignia while working with the public," and by enforcing that rule against Kangail. *Id.* at 1110 n.2.

Both the union and the company now petition for review. The union states that, although it believes the company violated section 8(a)(1) by maintaining a policy that prohibited e-mail use for all "non-job-related solicitations," it does not seek review of the Board's ruling to the contrary. *See* Union Br. 12-13. Instead, the union contends only that the company enforced its e-mail policy -- with respect to both the May and August e-mails -- in a manner that discriminated against the union. For its part, the company contends that the Board erred in finding that it discriminated as to Prozanski's May e-mail, but was correct in finding no discrimination with respect to those she

---

[3]Members Liebman and Walsh dissented in part. They would have found that "banning all nonwork-related 'solicitations' is presumptively unlawful absent special circumstances," *Guard*, 351 N.L.R.B. at 1121, and that even if it were not, the Register-Guard enforced the CSP in a discriminatory manner as to the August as well as the May e-mails, *id.* at 1131.

sent in August. The company also challenges the Board's determination that it committed an unfair labor practice by directing Kangail to cease displaying union insignia in public.

We assess the NLRB's decision under familiar standards: "We review the Board's factual conclusions for substantial evidence, defer to NLRB rules if they are rational and consistent with the Act, and uphold the Board's application of law to facts unless arbitrary or otherwise erroneous." *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 937 (D.C. Cir. 1998) (internal quotation marks and citations omitted). We address the e-mail issue in Part II and the insignia issue in Part III.

II

As noted above, for purposes of this case the union does not challenge the lawfulness of a company policy that bars union access to e-mail on a neutral basis. We therefore have no occasion to consider that issue, and we move directly to the question of whether the Register-Guard selectively enforced its e-mail policy against the union. "The law is clear that a valid no-solicitation rule applied in a discriminatory manner or maintained for discriminatory reasons may not be enforced against union solicitation." *Rest. Corp. of Am. v. NLRB*, 827 F.2d 799, 804-05 (D.C. Cir. 1987); *see ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1006 (D.C. Cir. 2001).

1. With respect to the May e-mail, we conclude that substantial evidence supports the determination that the company's decision to discipline Prozanski was unlawfully discriminatory. Enforcement of the Communication Systems Policy against Prozanski's May missive could not constitute a

neutral application of that policy because, simply put, the CSP did not cover such an e-mail.[4]

The Register-Guard's policy provided that its communication systems were not to be used "to solicit or proselytize for commercial ventures, religious or political causes, outside organizations, or other non-job-related solicitations." J.A. 123. Yet as the Board found, the May 4 e-mail "was not a solicitation. It did not call for action; it simply clarified the facts surrounding the Union's rally the day before." *Guard*, 351 N.L.R.B. at 1119. The dictionary defines to "solicit" as "[t]o try to obtain by entreaty, persuasion, or

---

[4]The Register-Guard objects that the union did not file a timely charge based on the discipline for the May e-mail, and that a complaint based on that discipline was therefore barred by section 10(b) of the NLRA, 29 U.S.C. § 160(b). But the NLRB has long permitted prosecution of any alleged violation that is "'closely related' to the allegations in a timely filed charge," *Ross Stores, Inc. v. NLRB*, 235 F.3d 669, 672 (D.C. Cir. 2001); *see Nickles Bakery of Ind., Inc.*, 296 N.L.R.B. 927, 928 (1989), and the ALJ found that the May allegation was "closely related" to the August allegation, which was timely charged, *Guard*, 351 N.L.R.B. at 1133 n.1 (ALJ Op.). Although the company has continued to object -- before both the Board and this court -- to the absence of a timely filed charge for the May allegation, it has never objected to the ALJ's finding that the May allegation may be prosecuted notwithstanding the absence of a timely filed charge because it comes within the "closely related" exception. Because the company did not object to the ALJ's finding before the Board, *see* Resp't's Exceptions to the Decision of the Administrative Law Judge ¶¶ 44-45 (S.A. 185), we are without jurisdiction to consider that objection now. *See* 29 U.S.C. § 160(e). Moreover, because the company also failed to raise that objection in its briefs before this court, *see* Oral Arg. Recording at 3:58-4:15, 41:20-41:30 (company's concession that it did not do so), it has twice waived any argument it might have had. *See Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003).

formal application," WEBSTER'S II NEW COLLEGE DICTIONARY 1050 (1999), and to "proselytize" as to try "[t]o convert from one faith or belief to another," *id.* at 888. Stretching these terms to cover what was nothing more than an attempt to correct a factual error in an earlier e-mail is simply more distortion than the words can bear.

The Board further found that the Register-Guard "permitted a variety of nonwork-related e-mails other than solicitations. Indeed, the CSP itself prohibited only 'nonjob-related solicitations,' not all non-job-related communications. The only difference between Prozanski's May e-mail and the e-mails permitted by the [Register-Guard] is that Prozanski's e-mail was union-related." *Guard*, 351 N.L.R.B. at 1119. Accordingly, the Board concluded that "the [Register-Guard's] enforcement of the CSP with respect to the May 4 e-mail discriminated along Section 7 lines and therefore violated Section 8(a)(1)." *Id.* That conclusion was certainly reasonable. In fact, in disciplining Prozanski for sending the May e-mail, the company did not even contend that the e-mail constituted solicitation or proselytization. Rather, Baker's May 5 disciplinary notice admonished her for "us[ing] the company's e-mail system expressly for the purpose of conducting Guild business." *Id.* at 1120 (quoting the May 5 memorandum, reproduced at J.A. 130). As the Board noted, it thus was "clear from the warning itself that the [Register-Guard] disciplined Prozanski for sending a union-related e-mail." *Id.*

2. We further conclude that substantial evidence does not support the Board's determination that the Register-Guard acted lawfully in disciplining Prozanski for the August e-mails. We agree with the Board that those e-mails did constitute solicitations, as they "called for employees to take action in support of the Union." *Id.* at 1119. But the Board did not find that the company disciplined Prozanski merely because the

e-mails were solicitations, as such discipline would have been inconsistent with the Register-Guard's practice of permitting other kinds of personal solicitations. As the Board noted, "[t]he evidence shows that the [Register-Guard] tolerated personal employee e-mail messages," including solicitations for "sports tickets or other similar personal items." *Id.* Rather, the Board found that it was not discriminatory to discipline Prozanski for the August e-mails because they were solicitations on behalf of an organization rather than an individual, and there was "no evidence that the [Register-Guard] permitted employees to use e-mail to solicit other employees *to support any group or organization*." *Id.* (emphasis added).

Whatever the propriety of drawing a line barring access based on organizational status, the problem with relying on that rationale here is that it is a post hoc invention; the company never invoked it before the General Counsel filed his complaint. The Communication Systems Policy made no distinction between solicitations for groups and for individuals, mentioning solicitations for "outside organizations" as just one example of the forbidden category of all "non-job-related solicitations." J.A. 123. Indeed, the Board's own description of the CSP acknowledged as much. *Guard*, 351 N.L.R.B. at 1110 (stating that the company "maintain[ed] a policy prohibiting the use of e-mail for *all* 'non-job-related solicitations'" (emphasis added)); *see Rest. Corp.*, 827 F.2d at 807 n.4 (noting that a company, by imposing an absolute bar on solicitations, "itself determine[s] what types of solicitation" it deems unacceptable). Equally significant, the Company's August disciplinary warning, which explained the rationale for disciplining Prozanski, did not invoke the organization-versus-individual line drawn by the Board. To the contrary, it told her to "refrain from using the Company's systems for union/*personal* business," J.A. 132 (emphasis added) -- the reference to "personal" making it clear that the offense did not depend on whether an organization was

involved.  In the same vein, the May disciplinary notice did not draw an organizational line either, but rather admonished Prozanski that it was impermissible "to use the company's e-mail for purposes other than company business."  *Id.* at 130

In short, neither the company's written policy nor its express enforcement rationales relied on an organizational justification.  The August memo gave only one explanation for disciplining Prozanski:  she had "use[d] the system for dissemination of union information."  *Id.* at 132.  Thus, the Board's observation concerning the May disciplinary warning -- that it was "clear from the warning itself that the [Register-Guard] disciplined Prozanski for sending a union-related e-mail," *Guard*, 351 N.L.R.B. at 1120 -- was equally true of the August warning.  Indeed, in practice the only employee e-mails that had ever led to discipline were the union-related e-mails at issue here.  *See Guard*, 351 N.L.R.B. at 1137 (ALJ Op.) ("[T]here was no enforcement of the communications policy on nonbusiness use, other than union use, of communications equipment.");  J.A. 52 (testimony of Dave Baker); *id.* at 167 (memorandum from Cynthia Walden to Bill Bishop).  On this record, substantial evidence does not support the Board's determination that Prozanski was disciplined for a reason other than that she sent a union-related e-mail.  *See St. Margaret Mercy Healthcare Ctrs. v. NLRB*, 519 F.3d 373, 375-76 (7th Cir. 2008) ("The hospital's rule forbids solicitations in patient care areas, period, yet the only solicitations that have ever drawn a rebuke from management are . . . those in support of union activities. . . . The singling out of the union-supporting nurse for rebuke was discrimination against union activities.").

III

Finally, we consider the Register-Guard's challenge to the Board's determination that it committed an unfair labor practice

by directing circulation district manager Ronald Kangail to stop wearing a union armband and displaying a union placard when working with the public.

"The right to wear union buttons or other insignia while at work is generally protected by [Section 7 of] the NLRA." *Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 946 (D.C. Cir. 1999) (citing *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-03 & n.7 (1945)). "In the absence of special circumstances, an employer's prohibition against wearing such insignia violates section 8(a)(1)." *Id.*; *see Waterbury Hotel Mgmt., LLC v. NLRB*, 314 F.3d 645, 655 (D.C. Cir. 2003); *Mack's Supermarkets, Inc.*, 288 N.L.R.B. 1082, 1098 (1988). When it bans the wearing of union insignia, the employer bears the burden of overcoming the presumption of an unfair labor practice by demonstrating that special circumstances exist. *See, e.g.*, *Wal-Mart Stores, Inc. v. NLRB*, 400 F.3d 1093, 1098 (8th Cir. 2005); *NLRB v. Malta Constr. Co.*, 806 F.2d 1009, 1011 (11th Cir. 1986); *Am. Fed'n of Gov't Employees, AFL-CIO*, 278 N.L.R.B. 378, 385 (1986).

Special circumstances may include, inter alia, ensuring employee safety, protecting the employer's product, or maintaining a certain employee image (especially with respect to uniformed employees). *See Nordstrom, Inc.*, 264 N.L.R.B. 698, 700 (1982). The company contends that there are special circumstances here, which it describes as follows: "It is vitally important to *The Register-Guard* that the public view it in the most positive light to encourage subscription sales. To maintain such a public image, *The Register-Guard*'s representatives (such as Mr. Kangail) who interact with the public must present a positive public image, putting *The Register-Guard* in a light that will make the public want to subscribe to *The Register-Guard*." Register-Guard Br. 47.

This claim that Kangail's appearance implicates a special circumstance simply because he interacts with the public is contrary to the NLRB's longstanding rule that "customer exposure to union insignia alone is not a special circumstance allowing an employer to prohibit display of union insignia by employees." *Flamingo Hilton-Laughlin*, 330 N.L.R.B. 287, 292 (1999); *see United Parcel Serv. v. NLRB*, 41 F.3d 1068, 1071 (6th Cir. 1994). Moreover, the company's assertedly special concern for its public image is at odds with the ALJ's finding that it maintained only an inconsistently described, "vague, unwritten insignia policy [that] has not been enforced in a wide variety of other situations." *Guard*, 351 N.L.R.B. at 1137 (ALJ Op.); *see NLRB v. Autodie Int'l, Inc.*, 169 F.3d 378, 384 (6th Cir. 1999) ("The employer's burden of justifying restrictions of Section 7 activity is particularly difficult to meet when the employer cannot show that its restrictions on [union insignia] comport with an announced policy of general applicability."). The company further contends that it has a "significant interest in maintaining its public image of impartiality," and that "the partial image [Kangail] perpetuated" by wearing union insignia "kept him from doing his job effectively and had the potential to lead to a decrease in the number of *The Register-Guard* customers." Register-Guard Br. 47-48. Although this appears to be a reference to the importance of maintaining an image of journalistic neutrality, the Register-Guard does not explain why that image would be threatened by the display of union insignia by an employee like Kangail -- who had no responsibility at all for reporting the news or formulating or articulating editorial policy.

We cannot say that the Board acted unreasonably in determining that the company failed to satisfy its burden of establishing special circumstances. *Guard*, 351 N.L.R.B. at 1110 n.2; *see Nordstrom*, 264 N.L.R.B. at 700-01. Kangail was a circulation department district manager whose principal

interaction was with contract carriers. The company has offered nothing beyond its conclusory claims to support the proposition that his wearing of a green armband or displaying other insignia of union support could reasonably be expected to have an adverse effect on business. We therefore will not set aside the NLRB's determination that the Register-Guard "violated Sec. 8(a)(1) by maintaining an overly broad rule prohibiting employees from wearing or displaying union insignia while working with the public." *Guard*, 351 N.L.R.B. at 1110 n.2.

## IV

For the foregoing reasons, we grant the union's petition for review, set aside the Board's determination that the disciplining of Prozanski for her August e-mails was not an unfair labor practice, and remand that matter for further proceedings consistent with this opinion. At the same time, we deny the Register-Guard's petition to review the Board's determinations that the company violated the National Labor Relations Act with respect to Prozanski's May e-mail and Kangail's display of union insignia. We grant the Board's cross-application for enforcement on those issues.

*So ordered.*